**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2011 JUN -8 PM 1:48

BY _____ CLERK
DEPUTY CLERK

| | |
|---|---|
| VERMONT HARD CIDER COMPANY, LLC d/b/a GREEN MOUNTAIN BEVERAGE, | ) ) ) ) |
| PLAINTIFF, | ) ) |
| v. | ) ) |
| LEONARD J. CIOLEK, | ) ) |
| DEFENDANT. | ) |

2:11-cv-150

## VERIFIED COMPLAINT

By and through its attorneys, Nixon Peabody LLP, Plaintiff, Vermont Hard Cider

Company, LLC d/b/a Green Mountain Beverage ("GMB" or the "Company") sets forth the

following as its Verified Complaint against Defendant, Leonard J. Ciolek.

## INTRODUCTION

GMB is in the business of producing the leading hard cider in the country. In July 2010,

Leonard J. Ciolek ("Ciolek") joined GMB as a senior sales executive. Although Ciolek had

experience in the beverage industry, he had no prior experience working with hard cider.

Just seven months later, on March 14, 2011, Ciolek abruptly resigned. In fact, as GMB

soon learned, Ciolek was about to launch his own line of hard ciders. Planning for this new line

took months – months when Ciolek was employed by GMB and owed a duty to it to promote its

products rather than engage in a directly competitive enterprise. Moreover, as a senior sales

executive, Ciolek had access to GMB's highly sensitive information regarding pricing, margins,

customers, marketing, and product development. GMB protected itself by (among other things)

13444032.3

requiring Ciolek to sign an Employee Non-Disclosure and Confidentiality Agreement (the "NDA"), the terms of which are discussed in detail below. Instead of abiding by the terms of the NDA, Ciolek abused the trust and confidence placed in him by, among other things, actively establishing a competitive enterprise; misappropriating GMB's trade secrets and proprietary information; and improperly retaining and using GMB's property, including its trade secrets and proprietary information, after he left the Company. Ciolek's conduct is in breach of the explicit terms of the NDA, and it violates multiple common law and statutory duties, entitling GMB to preliminary and permanent injunctive relief and damages.

## PARTIES

1.      Vermont Hard Cider Company, LLC is a Delaware limited liability company doing business as Green Mountain Beverage out of its headquarters located at 153 Pond Lane, Middlebury, Vermont 05753.

2.      Defendant Ciolek is a natural person residing at 4475 Old Transit Road, Orchard Park, New York 14127.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) due to the complete diversity of the parties, and the fact that the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

4.      This Court has personal jurisdiction over Ciolek pursuant to 12 V.S.A. § 913(b), because Ciolek transacted business within Vermont which gave rise to the claims asserted in this Verified Complaint.

5.      Venue is proper pursuant to 28 U.S.C. § 1391(a)(3), because Ciolek is subject to personal jurisdiction in this judicial district, as set forth in the preceding paragraph. Venue is

also proper pursuant to 28 U.S.C. § 1391(a)(2) and (3), as a substantial part of the events giving

rise to the claims asserted in this Verified Complaint occurred within this district, and GMB is

located within this district.

      6.    Pursuant to the NDA, the parties to this action have expressly agreed that "the

rights and obligations of the parties … shall be governed by and construed according to the laws

of the State of Vermont without giving effect to choice or conflict of law provisions." Further,

the Defendant "understands and agrees that he … [entered] into a contract which [required him]

to perform substantial services within the State of Vermont." Further, the parties to this action

"submit[ted] to the jurisdiction of … the United States District Court for the District of Vermont

in any action or proceeding arising out of or relating to" the NDA. The parties to this action

"waive[d] any objection they may have to venue to any such action or proceeding and to the

defense of an inconvenient forum with respect thereto." A true and correct copy of the NDA is

attached hereto as Exhibit A.

## RELEVANT FACTUAL BACKGROUND

### History of GMB's Business and its Market Position

      7.    Vermonters are sometimes referred to as "woodchucks," forming the basis for the

Woodchuck Hard Cider ("Woodchuck") brand and name. Woodchuck was first produced at a

small winery, operating out of a two-car garage in Proctorsville, Vermont in 1990. The winery

produced a variety of apple wines, a rarity among wineries.

      8.    Woodchuck was the first true American hard cider in centuries. GMB has owned

the Woodchuck brand since 2003. In 2007, Woodchuck became the first hard cider to sell more

than a million cases.

13444032.3

9.      Today, GMB produces 11,000 cases (or 264,000 bottles) of Woodchuck every day, shipping nine (9) or more truckloads daily to distributors in all fifty (50) states.

10.     GMB is a leader in the beverage industry.  GMB has more than three hundred (300) distributors nationwide selling Woodchuck to retailers, who in turn sell the product to consumers.  This large distribution network was built from the ground up over the last twenty (20) years, and it is one of GMB's strongest assets.

11.     GMB's success is attributable in large part to the development of certain trade secrets and proprietary information, including its business plan, customer lists, including wholesalers, distributors, and retailers, sales philosophy, pricing and margins, creative processes, business relationships with customers, and, of course, its recipes (collectively, the "Proprietary Information").  This Proprietary Information is primarily maintained in electronic format.

12.     GMB's Proprietary Information was developed over a considerable period of time and would be of great value to GMB's competitors.

GMB's Measures to Protect its Interests

13.     GMB has taken extensive measures to maintain and protect the secrecy of its Proprietary Information, including developing and circulating its employment policies regarding the importance of maintaining and protecting the confidentiality of its Proprietary Information.

14.     GMB's customary practice is to provide its employees with an Employee Handbook containing its employment practices and policies.

15.     On August 28, 2010, Ciolek received a copy of the Employee Handbook and signed an Acknowledgement of Receipt of the Employee Handbook.

16.     The Employee Handbook includes a discussion of "Business Ethics and Conduct."  Therein, GMB provides several (non-exclusive) examples of conduct considered

13444032.3                              - 4 -

unacceptable in the workplace, which conduct may result in disciplinary action, up to and

including termination of employment.  One example of such conduct is "[u]nauthorized

disclosure of business secrets or confidential information."

17.  GMB's Employee Handbook includes a discussion of company policy regarding

"Confidentiality."  The Employee Handbook provides, in relevant part, as follows:

> **Confidentiality**.  GMB employees shall not engage in private
> discussion of or otherwise disclose to third-parties information
> regarding GMB matters except when engaged in the conduct of
> the proper business of GMB.  All information that is not a matter of
> public record, or not otherwise authorized to be disclosed as
> public, shall be considered confidential.  Information that GMB
> considers to be confidential includes, but is not limited to, the
> following examples:
>
> - customer lists;
> - customer preferences;
> - depletion and sales information;
> - financial information;
> - marketing strategies;
> - new materials research;
> - pending projects and proposals;
>
> All employees will be required to sign a non-disclosure agreement
> as a condition of employment.  Employees who improperly use or
> disclose trade secrets or confidential business information will be
> subject to disciplinary action, up to and including termination of
> employment.

18.  Pursuant to these policies and consistent with its efforts to protect its Proprietary

Information, GMB has the following procedures in place: a) GMB restricts access to various

types of Proprietary Information to those employees who have a "need to know"; and b) GMB

requires the use of passwords to access Proprietary Information electronically; and c) hard copies

of Proprietary Information are stored in locked filing cabinets.

19.     Only GMB employees within the sales department have access to pricing

information, including information regarding margins, and customer lists.  Only a limited sub-

group of GMB employees within the production department have access to recipe information.

20.     The Employee Handbook also expressly defines employees' duties with respect to

loyalty, conflicts of interest, and the appropriate use of information technology systems.

21.     GMB's Employee Handbook provides, in relevant part, as follows:

> **Outside Activities**.  Outside employment or participation in the affairs
> of other organizations may create conflicts of interest or interfere
> with the employee's primary responsibilities to GMB.  However,
> employees may hold outside jobs if such jobs are disclosed to the
> Human Resources Manager, and if such jobs do not interfere with the
> employee's performance standards or GMB's scheduling demands on
> the employee.
>
> .     .     .
>
> Employee's [sic] must obtain prior written approval from the President
> of GMB before accepting any outside employment, directorship,
> fiduciary appointment, or responsibility that could involve a conflict
> of interest, or which would require a significant amount of an
> employee's time during normal working hours.
>
> Outside employment that constitutes a conflict of interest is prohibited.
> Employees may not receive any income or material gain from
> individuals outside GMB for materials produced or services rendered
> while performing their jobs.
>
> .     .     .
>
> **Computer, Telephone and Other Work-Related Information Policy**.
> The Company's applications systems, computer and telephone
> networks, electronic mail facilities, and electronic and manual
> data are the sole property of the Company and may not be used for
> an employee's personal business.  The Company's computer systems,
> electronic data, and written documents often are created by and/or
> entrusted to its employees.  Employees are expected to secure and
> protect confidential, proprietary, and trade secret information regarding
> the Company, its customers, employees and others.

**Internet and Email Guidelines**.

Acceptable Uses of the Internet/Email
Employees accessing the internet from Company computers and/or
communicating via Company email may be viewed as representing
the Company. All such access and communications, therefore,
should be for business-related reasons and not for personal business.

Unacceptable Uses of the Internet/Email
Employees accessing the internet from Company computers and/or
communicating via Company email are prohibited from doing so
for personal business purposes and/or personal gain…

Ciolek's Key Role at GMB

22.     Ciolek has spent his entire career in the beverage industry. He told GMB that he

had over twenty-five (25) years of experience, including having started a non-alcoholic beverage

company from scratch, building it to a multi-million dollar company in two (2) years' time. If

anything, Ciolek was overqualified for the position he ultimately sought with GMB.

23.     Prior to going to work for GMB, Ciolek did not have any specific experience with

selling or marketing hard cider.

24.     On May 26, 2010, Ciolek submitted his resume to GMB. Ciolek originally

applied for the position of National Sales Director, but GMB did not hire him into this position,

because he lived too far away from Company headquarters.

25.     On July 7, 2010, GMB offered the position of National Accounts Manager to

Ciolek. As National Accounts Manager, Ciolek reported directly to the National Sales Director,

the highest ranking position within the sales department at GMB. The sales department at GMB

consists of approximately twenty-five (25) employees.

26.     GMB offered Ciolek a six-figure base salary, with a vehicle allowance worth an

additional $6,900.00 annually, as well as an opportunity to earn a bonus of up to an additional

$25,000.00.

27.     On July 10, 2010, Ciolek accepted the offer by signing an Offer Letter.

28.     Ciolek began his employment with GMB on July 28, 2010.

29.     Within the July 7, 2010 Offer Letter, GMB established clear criteria regarding

trade secrets and Proprietary Information:

> During your employment at Green Mountain, you may gain access
> to certain non-public information relating to Green Mountain's
> business.  Such information is and shall remain proprietary to, and
> the property of Green Mountain.  You agree to keep such information
> in confidence, except as necessary to serve Green Mountain's
> legitimate purposes, and you further agree that upon your termination
> from Green Mountain, you will return to Green Mountain all
> documentation, correspondence, and all other data of Green Mountain
> then in your possession and all copies thereof.

30.     The Offer Letter also described GMB's policy regarding Conflicts of Interest:

> Your employment with Green Mountain will be on a full-time basis.
> During the term of your employment, you will not engage in any
> activity on behalf of, nor accept any salary, commissions, fee or
> compensation of any kind (other than investment income) from any
> person, firm or corporation other than Green Mountain.

#### The NDA Provides Additional Protection to GMB

31.     On August 28, 2010, Ciolek signed GMB's standard Employee Non-Disclosure

and Confidentiality Agreement (the "NDA").  *See* Exhibit A.  All GMB employees are asked to

sign the standard NDA as a condition of employment.

32.     Pursuant to Sections 1, 2 and 3 of the NDA, Ciolek agreed to the following:

> During the term of Employee's employment by the Company or at
> any time following the termination of Employee's employment by
> the Company for any or no reason, whether voluntary or involuntary,

with or without cause, Employee will not, without the express prior
written consent of the Company, disclose to others, use or publish
(other than as may be required by Employee's duties while employed
by the Company in the ordinary course of the Company's business)
any proprietary, secret or confidential information of the Company
("Company Information"), which for the purposes hereof shall include,
without limitation, information designated by the Company as
"proprietary," "secret," or "confidential" (or otherwise similarly
designated), or information which is not generally known to those
outside of the Company...

*See id.* at pp. 1 – 2.

"Company Information" specifically included information relating to:

(i)      the business, conduct or operations of the Company or any of
the Company's customers, licensors, licensees, suppliers,
vendors, consultants or employees; or

(ii)     any materials, techniques, recipes, specifications, devices,
processes, methods, ways of business, designs, programs,
formulas, technology, research, training methods, pricing
programs, development programs, business and marketing
plans, methods, manuals, and/or lists naming the parties in
the categories described in Section 1(a)(i) hereof and the
like, used in producing, organizing, promoting, conducting,
managing, packaging, distributing, or exploiting the
Company's products or services...

*Id.* at p. 1.

The NDA further provided that:

Upon the termination of Employee's employment by the Company
for any or no reason, whether voluntary of [sic] involuntary, with
or without case, Employee agrees that Employee will not take from,
but will promptly return to the Company, any drawings, notes, plans,
lists, computer programs or files, blueprints, letters, writings or any
other documents whatsoever or reproductions thereof recording,
reflecting or embodying any Company Information.

.        .        .

Non-Use.  Employee will use Company Information only for the
purpose of performing his or her duties as an employee of the

Company and only in connection with his or her employment and
for no other purpose. Employee will not use Company Information
for his or her own benefit or the benefit of another.

.      .      .

Ownership. The Employee agrees that all originals and all copies
of all documents, manuscripts, prints, drawings, manuals, diagrams,
notes, notebooks, reports, models, and all other materials containing,
representing, evidencing, recording, or constituting Company
Information however and whenever produced (whether by the
Employee or others), shall be the sole property of the Company.

.      .      .

Advice of Counsel. EMPLOYEE UNDERSTANDS THE LEGALLY
BINDING NATURE OF THIS AGREEMENT. EMPLOYEE
ACKNOWLEDGES THAT EMPLOYEE HAS BEEN ADVISED BY
THE COMPANY TO REVIEW THE TERMS OF THIS AGREEMENT
WITH LEGAL COUNSEL OF EMPLOYEE'S CHOICE AND THAT
EMPLOYEE HAS BEEN GIVEN REASONABLE OPPORTUNITY
TO SEEK SUCH LEGAL ADVICE.

*Id.* at pp. 2, 4.

Ciolek's Resignation

33.    On March 14, 2011, a mere seven (7) months after he accepted a position with

GMB, Ciolek sent an e-mail to Bret Williams and Terry Hopper, the President/CEO and National

Sales Director of GMB, respectively, and resigned his post, effective immediately.

34.    By way of explanation for his sudden and unexpected resignation, Ciolek said: "I

had received calls throughout the last few months regarding other opportunities within and out of

the Beverage Industry and never pursued any of them. More recently, I have been presented two

incredible opportunities of which I listened to what was being offered. Both of these position

[sic] are local and would provide a better lifestyle for my family."

35.     Ciolek further represented that he "was not looking to make any changes and was committed to a long term and continuous growth status with GMB." In fact, Ciolek's conduct during the prior seven months conclusively establishes otherwise.

Ciolek's Breaches

36.     For at least several months prior to his departure from GMB, Ciolek worked with Mayer Bros. of West Seneca, New York to establish a business which would directly compete with GMB.

37.     Mayer Bros. is a large and well-known cider mill. Mayer Bros. is the self-professed largest producer of bulk apple juice on the East Coast, as well as a leading co-packer for nationally known name brands.

38.     On February 1, 2011, McKenzie's Beverages, Inc. ("McKenzie's") became a New York domestic corporation. Its address of record with the New York Secretary of State is the address of Mayer Bros., 3300 Transit Road, West Seneca, New York 14224.

39.     Upon information and belief, McKenzie's produces, markets, and intends to sell a new product: McKenzie's Hard Cider ("McKenzie's Cider"). McKenzie's Cider is and will be in direct competition with Woodchuck.

40.     On February 4, 2011, a U.S. federal trademark registration was filed for "MCKENZIES HARD CIDER." This trademark is owned by Ciolek's wife, Julie Ann Ciolek (née Mack).

41.     GMB provided Ciolek with a laptop computer for Company business purposes only. GMB also paid for Ciolek's monthly internet access, his BlackBerry wireless device, which he used to make cellular telephone calls and to send and receive e-mails, and the monthly service fee for said device.

42.     Upon Ciolek's resignation, GMB immediately requested that Ciolek return his GMB-issued laptop computer.  On March 15, 2011, GMB sent Ciolek a box which he was directed to use to return the laptop computer to GMB.  Ciolek received the box on March 17, 2010.

43.     On April 4, 2011, GMB contacted Ciolek and inquired as to why the laptop computer had not been returned yet.

44.     Ciolek did not return GMB's laptop computer until April 14, 2011, a full month after his resignation.

45.     A third party forensic examination subsequently revealed that Ciolek had deleted his profile from the GMB-issued laptop computer.  When a profile is deleted, all data residing within the profile is removed.  In addition to the settings and configuration options, the data removed upon profile deletion includes: a) data residing in the user's "My Documents" directory (i.e., Microsoft Word, Excel, PowerPoint, etc.); b) data residing on the user's Desktop; c) e-mail related files residing in the user's profile (i.e., Microsoft Outlook OST and PST files); and d) internet history, cookies, and favorites.  Ciolek was not authorized to delete these data.

46.     Upon information and belief, during his employment with GMB, Ciolek retained NYCO Design Agency ("NYCO") to design logos, labels, and packaging for McKenzie's, and he has been working with NYCO since at least December 2010.

47.     On February 23, 2011, NYCO posted the following on its Facebook page: "Mckenzie's Hard Cider 24oz cans are in production with Rexam in Illinois.  Pretty excited for these peeps.  Drink UP!!!"

48.     NYCO's website (www.nycodesignagency.com) features prominently on its home page a large full-color image of a six-pack of McKenzie's Cider.

13444032.3                          - 12 -

49.     Upon information and belief, during his employment with GMB, Ciolek retained Rexam to manufacture cans and/or bottles for McKenzie's, and he has been working with Rexam since at least December 2010.

50.     Upon information and belief, during his employment with GMB, Ciolek retained Pri-Pak, Inc. of Lawrenceburg, Indiana to bottle McKenzie's Cider.

51.     Immediately following Ciolek's resignation, GMB began to hear industry rumors that Ciolek was developing and marketing McKenzie's Cider. Upon information and belief, while Ciolek was employed by GMB, Ciolek was promoting McKenzie's Cider to GMB's wholesalers, distributors, and retailers during the very meetings when he was being paid by GMB to promote Woodchuck.

52.     Notwithstanding Ciolek's efforts to cover his tracks by deleting data on his GMB-issued laptop computer, the forensic examination still revealed his extensive misconduct while employed by GMB. Data recovered from the GMB-issued laptop used by Ciolek during his employment with GMB has revealed the following communications, all of which took place during Ciolek's full-time employment with GMB:

   a.     On December 16, 2010, Ciolek sent an e-mail to a personal acquaintance, inviting him to "sample some McKenzie's."

   b.     On December 29, 2010, Mark Beresniewicz of NYCO e-mailed Ciolek with drafts of McKenzie's labels.

   c.     On January 17, 2011, Mr. Beresniewicz e-mailed Ciolek a sample of proposed packaging for McKenzie's. His e-mail stated: "The copy on the side panels is STOLEN from woodchuck [sic] and Samuel Smith. (FYI, really just for position)." Samuel Smith is a UK-based brewery which produces an organic hard cider.

   d.     On January 18, 2011, Ciolek e-mailed Mr. Beresniewicz and indicated that he was "meeting with a brewery tomorrow," presumably on behalf of McKenzie's.

e.     On January 18, 2011, Ciolek e-mailed Mr. Beresniewicz as follows: "We are going to need to get our labels approved by the TTB. This will include Nutrition facts, ingradiants [sic], origin of product and government warning label. We will probably just need bottle lable [sic] approved and not 6 pack carriers. I will discuss this with Garrett Mayer."

f.     On or about January 24, 2011, Garrett Mayer of Mayer Bros. e-mailed Ciolek to inquire as to the status of the McKenzie's trademark, to which Ciolek responded as follows: "It is published and application has been filed. You can TM the name based on Application and search." Ciolek also stated that "McKenzie's Hard Cider Trademark was originally filed on October 19th, 2010. We will transfer Mckenzie's [sic] Hard Cider TM to the newly formed company using the attached document."

g.     On or about January 24, 2011, Mr. Mayer e-mailed Ciolek and stated that "We need to add the exact nutrition facts and ingredients from the woodchuck [sic] label."

h.     On January 31, 2011, Mr. Beresniewicz e-mailed Ciolek regarding a working logo for McKenzie's.

i.     On February 24, 2011, Ciolek e-mailed Jim Hogan of Rexam regarding a planned visit the following week to Rexam's Illinois location.

j.     On March 1, 2011, Ciolek sent an e-mail to Ms. Sally Penders, stating that he was "[i]n [C]hicago proofing labels for a hard cider brand I am launching. I am partnered with [M]ayer [B]rothers to do this project. It is called McKenzie's Hard Cider. I will be resigning from my current gig [with GMB] on Friday so will not keep my appointment with [S]upervalue and will be there next month for our brand."

53.     On November 10, 2010 (and again later on February 15, 2011), Ciolek used the GMB-issued laptop computer to access GMB's trade secrets and Proprietary Information relating to pricing reports for various GMB brands (Woodchuck, Strongbow, and Wyder's) (the "Pricing Reports"). The Pricing Reports include details regarding FOB, tax, and highly confidential wholesale and retail margins. These details were compiled by GMB by way of time-consuming and extensive research. Ciolek saved this Proprietary Information to one or more removable

memory storage devices.  GMB did not issue any removable memory storage devices to Ciolek. Therefore, Ciolek still has this Proprietary Information in his possession.

54.     On December 9, 2010, Ciolek used the GMB-issued laptop computer to access and work on documents entitled "Business Plan McKenzie's" and "Business Plan," as well as a Microsoft Template entitled "Business plan for startup business."

55.     On December 13 and 14, 2010, Ciolek again used the GMB-issued laptop computer to access and work on "Business Plan McKenzie's."

56.     On December 14, 2010, at the same time he was working on the "Business Plan McKenzie's," Ciolek again accessed GMB's proprietary Pricing Reports.

57.     On December 16, 2010, at the same time he was working on logos and business plans for McKenzie's, Ciolek again accessed GMB's proprietary Pricing Reports.

58.     On December 17 and 18, 2010, Ciolek once again worked on business plans for McKenzie's.

59.     On January 10, 2011, Ciolek saved multiple McKenzie's documents to a removable memory storage device, while simultaneously saving Woodchuck presentations for Kroger to the same device.  Kroger is a well-known national chain of supermarkets, doing business primarily in the southern states.

60.     On January 24, 2011, Ciolek used the GMB-issued laptop to access and work on a "Trademark Agreement Assignment Template" for McKenzie's.

61.     On January 28, 2011, Ciolek used the GMB-issued laptop to access and work on a "Territory Agreement," presumably for McKenzie's.

62.     On January 28, 2011, and February 2, 4 and 7, 2011, Ciolek used the GMB-issued laptop computer to access and work on labels for multiple McKenzie's flavors, including original, black cherry and green apple.

63.     S.K.I. Beer Corp. ("SKI") is a well-known distributor of beer and malt beverages serving Manhattan, Queens, Brooklyn, The Bronx, Staten Island, and Westchester, Putnam and Duchess Counties and all of Long Island.

64.     SKI is one of GMB's distributors. Ciolek first became acquainted with SKI through his employment with GMB. Ciolek was introduced to SKI by GMB's National Sales Director. Indeed, one of Ciolek's duties during his employment with GMB was to foster and grow the relationship between GMB and SKI.

65.     On November 29, 2010 and December 16, 2010, Ciolek accessed a document entitled "SKI WC Working File" using a removable memory storage device. On December 14, 16, 18 and 20, 2010, and again on January 10, 2011, Ciolek accessed a document entitled "Business Plan SKI" using a removable memory storage device.

66.     Upon information and belief, SKI is now distributing McKenzie's.

67.     As alleged above (para. 52(g)), Ciolek and Mayer Bros. wrote that they intended to copy Woodchuck's "exact" nutrition facts and ingredients.

68.     GMB purchased bottles of McKenzie's Original Hard Cider, Green Apple Hard Cider and Black Cherry Hard Cider at a retail store.

69.     As the color photographs attached hereto as Exhibits B through G demonstrate, Ciolek has indeed copied Woodchuck's exact nutrition facts and ingredients, down to the most minute detail.

70.     McKenzie's cans and bottles have been distributed to retailers bearing Woodchuck's nutritional facts and ingredients.

71.     The nutritional facts on the McKenzie's cans and bottles are inconsistent with independent laboratory results.  For example, the testing results reveal that McKenzie's Original Hard Cider actually has 230 calories per serving, McKenzie's Green Apple Hard Cider has 220 calories per serving, and McKenzie's Black Cherry Hard Cider has 240 calories.  Upon information and belief, the nutritional labels affixed to all of the McKenzie's cans and bottles incorrectly state that each serving, no matter the flavor, has only 200 calories.

72.     Pursuant to Code of Federal Regulations, 21 C.F.R. § 101.9(g)(5), "[a] food with a label declaration of calories, sugars, total fat, saturated fat, *trans* fat, cholesterol, or sodium shall be deemed to be misbranded under section 403(a) of the [Nutrition Labeling and Education Act] if the nutrient content of the composite is greater than 20 percent in excess of the value for that nutrient declared on the label."  Hard cider is subject to this regulation.

73.     Ciolek's conduct, outlined above, demonstrates that during the course of greater than half of his employment with GMB, which was intended to be full-time, Ciolek was actively and consistently working, not for the benefit of his employer, but for the benefit of McKenzie's.

74.     On April 27, 2011, the undersigned counsel sent Ciolek a written demand to cease and desist his unauthorized use of GMB's Company Information.  Therein, the undersigned also requested that Ciolek preserve all records relevant to this dispute.  The demand was sent via e-mail and certified mail.  On May 26, 2011, the certified mailing was returned to sender as unclaimed.

13444032.3                                             - 17 -

## COUNT I
### Breach of Contract
### Employee Non-Disclosure and Confidentiality Agreement

75.     GMB incorporates by reference and realleges the foregoing allegations as if fully set forth herein.

76.     As described more completely above, Ciolek entered into the NDA with GMB.

77.     Ciolek continuously breached his obligations under the NDA by, *inter alia*, impermissibly disclosing Company Information (as that term is defined above) to others, impermissibly using or publishing Company Information, and impermissibly retaining Company Information following his termination, all with the purpose of benefitting his own competitive enterprise, McKenzie's.

78.     As a direct, proximate, and actual result of this conduct, GMB suffered damages for which Ciolek is liable.

## COUNT II
### Breach of Duty of Loyalty

79.     GMB incorporates by reference and realleges the foregoing allegations as if fully set forth herein.

80.     Ciolek was one of GMB's most senior salespeople.  Ciolek held a position of trust and confidence with the Company.  As such, Ciolek owed a duty of loyalty to GMB.  That duty required that Ciolek act solely for the benefit of GMB, and not to its detriment, during the course of his employment.

81.     As described more completely above, Ciolek breached that duty of loyalty by, *inter alia*, while still employed by GMB, actively engaging in and using Company resources, including trade secrets and Proprietary Information, to start up a competitor, McKenzie's; by

soliciting and appropriating business opportunities belonging to GMB for his own benefit and for
the benefit of McKenzie's, and not the benefit of his employer; and by failing to disclose
material information to GMB.

82.     As a direct, proximate, and actual result of this conduct, GMB suffered damages
for which Ciolek is liable.

## COUNT III
### Violation of 9 V.S.A. § 4601 *et seq*, Vermont Trade Secrets Act

83.     GMB incorporates by reference and realleges the foregoing allegations as if fully
set forth herein.

84.     GMB's confidential and proprietary information, including, but not limited to
customer lists and the Pricing Reports, constitutes a "trade secret" within the meaning of 9
V.S.A. § 4601(3).

85.     GMB derived actual and/or potential independent economic value from such
knowledge and information being generally unknown to the public and not readily ascertainable
by proper means by other persons who could also obtain economic value from the disclosure or
use of this knowledge and information.

86.     GMB made reasonable efforts under the circumstances to maintain the secrecy
and confidentiality of its trade secrets.

87.     Upon information and belief, Ciolek has disclosed GMB's trade secrets to Mayer
Bros., McKenzie's and others, or he will imminently make such disclosures.  Ciolek's actual or
threatened disclosure of GMB's trade secrets to Mayer Bros., McKenzie's and others, and
Ciolek's use thereof constitutes "misappropriation" within the meaning of 9 V.S.A. § 4601(2).

88.     The circumstances of Ciolek's prior, current, and ongoing involvement with Mayer Bros. and McKenzie's will lead to the inevitable ongoing disclosure of GMB's trade secrets.

89.     Ciolek's actions were willful and malicious.

90.     As a direct, proximate, and actual result of Ciolek's misappropriation of GMB's trade secrets and violation of the Vermont Trade Secrets Act, GMB is entitled to actual damages, unjust enrichment damages, punitive damages, and the award of attorneys' fees.

## COUNT IV
### Conversion

91.     GMB incorporates by reference and realleges the foregoing allegations as if fully set forth herein.

92.     Ciolek intentionally exercised dominion and/or control over GMB's property, including, but not limited to, the laptop computer described above.

93.     Ciolek intentionally destroyed GMB's property by removing certain data from GMB's laptop computer.

94.     Upon information and belief, Ciolek has transferred GMB's property, including its trade secrets and Proprietary Information, to other devices, such as removable memory storage devices.

95.     Ciolek thereby interfered with GMB's right to control said property.

96.     Ciolek's assumption and exercise of dominion and control over this property was not authorized by GMB.

97.     As a direct, proximate, and actual result of this conduct, GMB suffered damages for which Ciolek is liable.

## APPLICATION FOR PRELIMINARY RELIEF PURSUANT TO Fed. R. Civ. P. 65

98.     GMB incorporates by reference and realleges the foregoing allegations as if fully set forth herein.

99.     Ciolek's actions have caused, and if not enjoined, will continue to cause, immediate and irreparable harm to GMB, for which GMB has no adequate remedy at law.

100.    Pursuant to 9 V.S.A. § 4602(a), GMB is entitled to injunctive relief in the form of an Order enjoining actual or threatened misappropriation of its trade secrets.

101.    Pursuant to 9 V.S.A. § 4602(c), affirmative acts to protect GMB's trade secrets may be compelled by an Order of this Court.

102.    Section 9 of the NDA provides, in relevant part, as follows:

> Injunctive Relief.  Employee hereby expressly acknowledges
> and agrees that any breach or threatened breach of any of the
> terms set forth in Sections 1 or 2 of this Agreement may result
> in significant and irreparable damage to the Company.  Therefore,
> Employee agrees that the Company shall be entitled, in addition
> to any other remedies available at law, to injunctive or other
> equitable relief by a court of appropriate jurisdiction in the event
> of any breach or threatened breach of the terms of Sections 1
> or 2 of this Agreement.

103.    GMB should be awarded preliminary and permanent orders to Ciolek and his agents, employees, and other persons who are in active concert or participation with him, as follows:

    a)  Preventing him from accessing, disclosing or otherwise using GMB's trade secrets or Proprietary Information in any manner;

    b)  Preventing him from using, disclosing, misusing, or further converting in any manner or in any form any of GMB's trade secrets or Proprietary Information;

13444032.3

c) Preventing him from any use of any kind of information improperly obtained from or using GMB's computers and/or network;

d) Preventing him from destroying, altering, damaging or otherwise disposing of any documents, files, or any other information acquired, directly or indirectly, from GMB;

e) Requiring him to return to GMB any and all originals and copies of GMB property, documents, data and other property taken or received from others, including, but not limited to, GMB's trade secrets or Proprietary Information;

f) Requiring him to preserve all personal hard drives and memory storage devices and enjoining him from destroying, altering or deleting any information stored on them that Ciolek might have copied from GMB; and

g) Requiring that a complete forensic analysis by a forensic analysis of Plaintiff's choosing be performed on all of Ciolek's personal hard drives and memory storage devices.

## **JURY DEMAND**

GMB hereby requests a trial by jury on all issues so triable.

WHEREFORE, GMB respectfully requests that the Court:

A.    Enter a preliminary injunction, following a hearing, in the proposed form filed on even date herewith;

B.    Enter a permanent injunction following trial;

C.    Award GMB damages resulting from Ciolek's conduct;

13444032.3                                    - 22 -

D.    Award GMB punitive damages resulting from Ciolek's willful and malicious

conduct;

E.    Award GMB its costs and attorney's fees; and

F.    Award such further relief as this Court deems just, equitable and proper.


                                        Respectfully submitted,

Dated: June 7, 2011                     VERMONT HARD CIDER COMPANY,
                                        LLC d/b/a GREEN MOUNTAIN
                                        BEVERAGE

                                        By its attorneys


                                        Gordon J. MacDonald, Esq. (Motion for
                                        Admission *Pro Hac Vice* pending)
                                        Holly J. Kilibarda, Esq. (VT Bar No. 4165)
                                        NIXON PEABODY LLP
                                        900 Elm Street
                                        Manchester, N.H. 03101
                                        (603) 628-4000
                                        gmacdonald@nixonpeabody.com
                                        hkilibarda@nixonpeabody.com

## VERIFICATION OF COMPLAINT

Facts verified by,

Vermont Hard Cider Company, LLC d/b/a
Green Mountain Beverage

Dated: June 3, 2011

By:  Bret Williams
President and CEO
Duly authorized

**STATE OF RHODE ISLAND**
**COUNTY OF** Washington

Personally appeared, Bret Williams, the duly authorized President and CEO of Plaintiff
Vermont Hard Cider Company, LLC d/b/a Green Mountain Beverage, and averred the truth of
the foregoing Complaint to the best of his knowledge, information and belief.

Notary Public/Justice of the Peace
My commission expires: 3-28-15

KATHY L. VELLE
*NOTARY PUBLIC*
MY COMMISSION EXPIRES 3-28-15